Stephen R. GLASSROTH, Plaintiff,

v.

Roy S. MOORE, Chief Justice of the Alabama Supreme Court, Defendant.

Melinda Maddox and Beverly Howard, Plaintiffs,

v.

Roy Moore, in his official capacity, Defendant.

Civil Action Nos. 01–T–1268–N, 01–T–1269–N.

United States District Court, M.D. Alabama, Northern Division.

Nov. 18, 2002.

1292

J. Richard Cohen, Morris S. Dees, Jr., Rhonda Brownstein, Danielle Jeannine Lipow, Montgomery, AL, James A. Tucker, Alabama Disabilities Advocacy Program, Tuscaloosa, AL, for Stephen R. Glassroth.

Robert M. Weinberg, Montgomery, AL, William Z. Messer, Robert J. Varley, Varley & Messer, LLP, Montgomery, AL, for Beverly J. Howard.

William Z. Messer, Robert J. Varley, Varley & Messer, LLP, Montgomery, AL, Ayesha Khan, Americans United for Separation of Church & State, Washington, DC, for C. Wade Johnson, Robert A. Beckerle.

Robert M. Weinberg, Montgomery, AL, William Z. Messer, Robert J. Varley, Varley & Messer, LLP, Montgomery, AL, Ayesha Khan, Americans United for Separation of Church & State, Washington, DC, for Melinda Maddox.

Herbert W. Titus, Troy A. Titus, PC, Virginia Beach, VA, D. Stephen Melchior, Deputy AG for State of Alabama, Cheyenne, WY, Philllip L. Jauregui, LLC, Birmingham, AL, for Roy S. Moore.

John J. Park, Jr., Charles B. Campbell, Office of Atty. Gen., Montgomery, AL, for Rich Hobson.

## OPINION

MYRON H. THOMPSON, District Judge.

■ The Establishment Clause of the First Amendment, made binding upon the States through the Fourteenth Amendment to the United States Constitution, provides that government "shall make no law respecting an establishment of religion." The question presented to this court is whether the Chief Justice of the Alabama Supreme Court violated the Establishment Clause when he placed a slightly over two-and-a-half ton granite monument—engraved with the Ten Commandments and other references to God—in the Alabama State Judicial Building with the specific purpose and effect, as the court finds from the evidence, of acknowledging the Judeo–Christian God as the moral foundation of our laws. To answer this question, the court applies two Supreme Court precedents: *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983).

Based on the evidence presented during a week-long trial and for the reasons that follow, this court holds that the evidence is overwhelming and the law is clear that the Chief Justice violated the Establishment Clause. But, in announcing this holding today, the court believes it is important to clarify at the outset that the court does not hold that it is improper in all instances to display the Ten Commandments in government buildings; nor does the court hold that the Ten Commandments are not important, if not one of the most important, sources of American law. Rather the court's limited holding, as will be explained below in more detail, is that the Chief Justice's actions and intentions in this case crossed the Establishment Clause line between the permissible and the impermissible.

### I.

The plaintiffs in these two consolidated lawsuits are Stephen R. Glassroth, Melinda Maddox, and Beverly Howard. The defendant is Roy S. Moore, Chief Justice of the Alabama Supreme Court. The plaintiffs seek enforcement of the First and Fourteenth Amendments to the United States Constitution through 42 U.S.C.A. § 1983. The court's jurisdiction has been properly invoked pursuant to 28 U.S.C.A. §§ 1331 (federal question) and 1343(a)(3) (civil rights).

The events giving rise to this litigation go back several years. As a state court judge in Gadsden, Alabama, then-Judge Moore displayed a hand-carved plaque of the Ten Commandments in his courtroom. He also invited clergy to lead prayer in his courtroom before trials. These acts led to

two highly publicized lawsuits involving the American Civil Liberties Union of Alabama. The first, brought in March 1995, was dismissed for lack of standing. *See Alabama Freethought Ass'n v. Moore*, 893 F.Supp. 1522 (N.D.Ala.1995). The second, brought in April 1995 by the State of Alabama, sought a declaratory judgment that Judge Moore's display of the Ten Commandments was constitutional; that lawsuit was dismissed by the Alabama Supreme Court as nonjusticiable. *See Alabama ex rel. James v. ACLU of Alabama*, 711 So.2d 952 (Ala.1998). A large part of Judge Moore's funding for these lawsuits—$170,000—came from Coral Ridge Ministries, an evangelical Christian media outreach organization with television and radio broadcasts that cover all major Alabama cities.

On November 7, 2000, Judge Moore was elected Chief Justice of the Alabama Supreme Court. During his campaign for Chief Justice, Judge Moore capitalized on the name recognition that he had obtained during the 1995 lawsuits. Judge Moore's campaign referred to him as the "Ten Commandments Judge," and virtually everything put out by the campaign referenced the Ten Commandments. Shortly after his election, now-Chief Justice Moore began designing a monument depicting, in his words, "the moral foundation of law" and reflecting "the sovereignty of God over the affairs of men." By God, the Chief Justice specifically meant the Judeo–Christian God of the Holy Bible and not the God of any other religion.

On August 1, 2001, Chief Justice Moore unveiled a 5,280–pound granite monument in the large colonnaded rotunda of the Alabama State Judicial Building, which houses the Alabama Supreme Court, the Court of Criminal Appeals, the Court of Civil Appeals, the state law library, and the Alabama Administrative Office of Courts. Coral Ridge Ministries filmed both the monument's installation, which occurred the night before, and its unveiling; it was the only media outlet to film both occasions. The Chief Justice installed the monument with neither the approval nor the knowledge of the Alabama Supreme Court's other eight justices. He made all final decisions with regard to the specific language appearing on the monument, as well as its size, shape, color, and location within the Judicial Building. No tax dollars were used in the monument's construction or installation. Chief Justice Moore has final authority over what decorations may be placed in the Judicial Building rotunda.

The monument is located directly across from the main entrance to the Judicial Building, in front of a large plate-glass window, with a courtyard and waterfall behind it. The monument and the area surrounding it are roped off. A person entering the Judicial Building through its main entrance, and looking across the large open area of the rotunda, will see the monument immediately. The Judicial Building's public stairwell, public elevator, and law library are all accessed through the rotunda. Anyone who uses the public bathrooms in the Judicial Building rotunda must walk by the monument. The Chief Justice chose to display the monument in this location so that visitors to the Alabama Supreme Court would see the monument. While not in its center, the monument is the centerpiece of the rotunda.

The monument is in the shape of a cube, approximately three feet wide by three feet deep by four feet tall. The top of the monument is carved as two tablets with rounded tops, the common depiction of the Ten Commandments; these tablets slope toward a person viewing the monument from the front. The tablets are engraved with the Ten Commandments as excerpted from the Book of Exodus in the King

James Bible. Due to the slope of the monument's top and the religious appearance of the tablets, the tablets call to mind an open Bible resting on a lectern. A picture of the front view of the monument is attached as Appendix A to this opinion.

Engraved on the left tablet is: "I am the Lord thy God"; "Thou shalt have no other Gods before me"; "Thou shalt not make unto thee any graven image"; "Thou shalt not take the name of the Lord thy God in vain"; and "Remember the sabbath day, to keep it holy." Engraved on the right tablet is: "Honour thy father and thy mother"; "Thou shalt not kill"; "Thou shalt not commit adultery"; "Thou shalt not steal"; "Thou shalt not bear false witness"; and "Thou shalt not covet." In addition, the four sides of the monument are engraved with fourteen quotations from various secular sources; these sources are identified on the monument to the extent that each quotation is accompanied by the name of a document or an individual. On each side of the monument, one of the quotations is larger than the others and is set apart in relief. The smaller quotations on each side are intended to relate to that larger quotation. The north (front) side of the monument has a large quotation from the Declaration of Independence, "Laws of nature and of nature's God," and smaller quotations from George Mason, James Madison, and William Blackstone that speak of the relationship between nature's laws and God's laws. The large quotation on the west (right) side of the monument is the National Motto, "In God We Trust"; the smaller quotations on that side were excerpted from the Preamble to the Alabama Constitution and the fourth verse of the National Anthem. The south (back) side of the monument bears a large quotation from the Judiciary Act of 1789, "So help me God," and smaller quotations from George Washington and John Jay speaking of oaths and justice. The east (left) side of the monument has a large quota-

tion from the Pledge of Allegiance 1954, "One nation under God, indivisible, with liberty and justice for all," and smaller quotations from the legislative history of the Pledge, James Wilson, and Thomas Jefferson suggesting that both liberty and morality are based on God's authority. The full quotations from all four sides of the monument are attached as Appendix B to this opinion.

Additionally, at the request of the parties, the court visited the monument before beginning trial because all agreed that a personal on-site viewing of the monument was essential to capture fully not only the monument but its context as well. The court found the monument to be, indeed, much more than the sum of its notable quotations, large measurements, and prominent location. The court was captivated by not just the solemn ambience of the rotunda (as is often true with judicial buildings), but by something much more sublime; there was the sense of being in the presence of something not just valued and revered (such as an historical document) but also holy and sacred. Thus, it was not surprising to the court that, in describing the process of designing the monument, the Chief Justice emphasized that the secular quotations were placed on the sides of the monument, rather than on its top, because these statements were the words of mere men and could not be placed on the same plane as the Word of God. Nor was it surprising to the court that, as the evidence reflected, visitors and building employees consider the monument an appropriate, and even compelling, place for prayer. The court is impressed that the monument and its immediate surroundings are, in essence, a consecrated place, a religious sanctuary, within the walls of a courthouse.

At the monument's unveiling ceremony, Chief Justice Moore made a speech noting

that the monument depicted the "moral foundation of law." But consistent with the impression the court had when it viewed the monument and consistent with his intent to design the monument to emphasize the preeminence of God's Word, the Chief Justice made clear the monument was ultimately a monument to the giver of this moral foundation, the Judeo–Christian God, and, in particular, to his sovereignty over all the affairs of men. He explained that the monument "serves to remind the Appellate Courts and judges of the Circuit and District Court of this State and members of the bar who appear before them, as well as the people of Alabama who visit the Alabama Judicial Building, of the truth stated in the Preamble to the Alabama Constitution that in order to establish justice we must invoke 'the favor and guidance of almighty God.'" The Chief Justice expressed his disagreement with those judges and other government officials who "purport that it is government—and not God—who gave us our rights." He said that these officials have "turned away from those absolute standards that serve as the moral foundation of law." In the Chief Justice's opinion, to restore this moral foundation of law, "we must first recognize the source from which all morality springs . . . [by] recogniz[ing] the sovereignty of God." Finally, the Chief Justice said that he hoped that "this day marks the beginning of the restoration of the moral foundation of law to our people and a return to the knowledge of God in our land." Because of its importance to this litigation, a transcript of the Chief Justice's entire speech is attached as Appendix C to this opinion.

At the time of its installation, the monument was intended to be the only object decorating the Judicial Building rotunda. Almost two months later, though, the Chief Justice added two more displays to the rotunda. The first, added in late September, is a marble plaque with quotations from Rev. Dr. Martin Luther King, Jr., speaking of just and unjust laws, and Frederick Douglass, speaking of the injustice of slavery, entitled "Moral Foundation of Law." The Chief Justice commissioned this plaque himself. The moral foundation of law plaque is forty-two inches by thirty-two inches and is located on a wall seventy-five feet away from the monument. The Chief Justice installed this plaque because the contributions of these men "have been significant and their reliance upon the laws of God to secure freedom and liberty should be recognized and would support the very purpose of the Ten Commandments monument." The full text of this plaque is attached as Appendix D to this opinion.

Added in early October, the second display is a brass plaque with the Bill of Rights to the United States Constitution. This plaque was discovered in a box in the Judicial Building shortly before it was put on another wall in the rotunda. It, too, is located on the wall, seventy-five feet from the monument; this plaque is thirty inches by thirty-six inches. The Chief Justice testified that this plaque was placed in the rotunda because it also comported with the "moral foundation of law" theme.

No sign indicates that the monument is connected with or related to these plaques. A person standing directly in front of the monument cannot see either plaque. Indeed, unlike the monument, the plaques are behind the rotunda colonnade. Visitors to the Judicial Building could easily miss or overlook the plaques. Indeed, in their written submissions to the court, the Chief Justice's attorneys described the plaques as "inconspicuous." At trial, and long after plaintiffs' attorneys had in their own submissions specifically noted this concession, the Chief Justice's attorneys said that they had misspoken and intended to describe the plaques as "conspicuous." Having seen the plaques, the court agrees

with the Chief Justice's attorneys' first description of the plaques, intended or not.

Others have requested that the Chief Justice include additional items to the rotunda, requests that the Chief Justice has denied because the proposed items did not comport with the moral foundation of law theme. Alabama State Representative Alvin Holmes requested the inclusion of a monument containing Rev. Dr. Martin Luther King, Jr.'s "I Have a Dream" speech, a request that the Chief Justice denied. In denying this request, the Chief Justice stated, "The placement of a speech of any man alongside the revealed law of God would tend in consequence to diminish the very purpose of the Ten Commandments monument." Additionally, an atheist group's request to display a sculpture of an atheist symbol—an atom—was denied by the Chief Justice as inconsistent with the rotunda's theme.

## II.

### A.

■ Chief Justice Moore argues that these two lawsuits should be dismissed because the plaintiffs do not have standing to bring them. The Supreme Court has held that, at "an irreducible minimum," a person seeking to invoke a court's authority must have standing, that is, must be able to " 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.' " *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted). To have standing to challenge a display under the Establishment Clause, the plaintiffs must suffer personal injury "*as a consequence* of the alleged constitutional error, other than the psychological

consequence presumably produced by observation of conduct with which one disagrees." *Id.* at 485, 102 S.Ct. at 765 (emphasis in original). The personal injury may be noneconomic in nature. *Id.* at 486, 102 S.Ct. at 766. An "effect on an individual's use and enjoyment of public land is a sufficient noneconomic injury to confer standing to challenge governmental actions." *ACLU of Georgia v. Rabun County Chamber of Commerce, Inc.,* 698 F.2d 1098, 1105 (11th Cir.1983).

■ All three plaintiffs are attorneys who regularly practice law in Alabama's courts. Each has testified that he or she has come into direct contact with the monument on multiple occasions, and each expects to do so in the future as a result of his or her professional obligations. Each finds the monument offensive, and each has said the monument makes him or her feel like an "outsider." Furthermore, two plaintiffs, Howard and Maddox, have changed their behavior as a result of the monument: each visits the rotunda less frequently and enjoys the rotunda less because of the monument's presence. The monument has, therefore, had a direct negative effect on each plaintiff's "use and enjoyment" of the rotunda. *Id.* at 1105.

The Chief Justice responds that the plaintiffs, nevertheless, do not have standing to bring these cases on the ground that their testimony is not credible. Toward this, the Chief Justice has elicited statements by the plaintiffs showing that they were offended by the Chief Justice's actions before he placed the monument in the State Judicial Building rotunda. For example, plaintiff Glassroth testified in his deposition that he found the use of the Ten Commandments in the Chief Justice's campaign to be "a shameless political use of religion." Plaintiff Maddox, too, thinks that the Chief Justice is "using religion to further his political career"; she also says she was "embarrassed" by the Chief Jus-

tice long before he was elected Chief Justice, when, as a state trial judge, he displayed a Ten Commandments plaque in his courtroom. Maddox admitted she was willing to become a plaintiff in these cases before she saw the monument in person. Finally, plaintiff Howard says she is bothered by the Chief Justice's reliance on his religious views in making his decisions as Chief Justice.

While these facts show that the plaintiffs may have been predisposed to being offended by the monument, they do not go so far as to discredit their testimony that they are, in fact, offended by the monument. Instead, the Chief Justice simply has demonstrated that the plaintiffs have been previously offended by his actions. The Chief Justice suggests that, because of this previous offense, the plaintiffs cannot also have been injured by the monument. This argument is untenable. The plaintiffs' previous offense is consistent with, rather than contradictory to, their offense about the monument. If the court were to find otherwise, it would be mandating that plaintiffs must assert their claims at the first instance of their offense to a defendant's actions or lose their opportunity to complain about later actions; conversely, such holding would also mean that government officials could act without regard to the constitutionality of their actions, so long as they first offended any potential plaintiffs at an earlier time.

The Chief Justice also takes issue with the plaintiffs' testimony that they feel like "outsiders"; he maintains that they are independent thinkers, or are actively involved in their communities, or are thick-skinned. He observes that plaintiff Glassroth serves as a member of the board of directors for the Federal Defenders of the Middle District of Alabama and on the Alabama Sentencing Commission; that plaintiff Maddox is referred to by others and even herself as "the tiny tiger"; and that plaintiff Howard identifies herself as a political independent. The fact that the plaintiffs are strong and accomplished individuals in general, however, is not inconsistent with the fact that they feel like, and are, outsiders within the walls of the Alabama State Judicial Building. If anything, this fact reflects that the plaintiffs are among the few, if not the only, attorneys who have the commendable courage to sue a judge or justice to seek personal redress under the First Amendment for the harm they have suffered and continue to suffer. Standing is not the sole province of the weak; if anything, as a matter of practice if not the law, it is that of the strong, for only they will rise to assert it.

The plaintiffs have all testified that they have been injured as a direct result of their contact with the monument, and the court finds their testimony credible in full. The plaintiffs have standing to pursue their Establishment Clause claim.[1]

---

1. Admittedly, in *Alabama Freethought Ass'n v. Moore*, 893 F.Supp. 1522 (N.D.Ala.1995), mentioned earlier, the district court found that the plaintiffs lacked standing. In that case, the court found that the plaintiffs did not provide "allegation[s] nor evidence that plaintiffs [were] in imminent threat of being" subjected to the challenged display, *id.* at 1544, nor did the plaintiffs provide evidence that their regular course of business required their presence in Judge Moore's courtroom. *Id.* at 1528–29. Indeed, only one plaintiff in that case was ever required to be in Judge Moore's courtroom, and, then, only for a few moments. *Id.* at 1527. The plaintiffs tried to assert standing on the fact that they were "subject to" the possibility of coming into contact with the challenged display, either as potential litigants or jurors in Judge Moore's courtroom. *Id.* at 1544. The case before this court is patently distinguishable, as each plaintiff testified that their professional duties did require and will continue to require their presence in the Alabama State Judicial Building. Therefore, the district court's finding in *Alabama Freethought Association,* that the plaintiffs lacked standing, has no bearing on

## B.

█ With the standing issue resolved, the court moves to the heart of its Establishment Clause inquiry. For a practice to survive an Establishment Clause challenge, it "must have a secular legislative purpose, . . . its principal or primary effect must be one that neither advances nor inhibits religion, . . . [and it] must not foster 'an excessive government entanglement with religion.'" *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) (citations omitted). The plaintiffs contend that Chief Justice Moore's display of the monument fails this test, frequently called the *Lemon* test, in two ways: (1) his fundamental, if not sole, purpose in displaying the monument was non-secular; and (2) the monument's primary effect advances religion.

### 1.

That Chief Justice Moore's purpose in displaying the monument was non-secular is self-evident. First, it is self-evident from his own words. At the monument's unveiling ceremony, the Chief Justice explained that the monument "serves to remind . . . that in order to establish justice we must invoke 'the favor and guidance of almighty God.'" He made clear that, in order to restore this moral foundation of law, "we must first recognize the source from which all morality springs . . . [by] recogniz[ing] the sovereignty of God." Thus, he made clear that, while the monument depicted the "moral foundation of law," it was ultimately a monument to the giver of this foundation, the Judeo–Christian God. He saw the placement of the monument in the Judicial Building rotunda as not only "the beginning of the restoration of the moral foundation of law to our people," but, more fundamentally, as "a return to the knowledge of God in our land."

In his trial testimony before this court, the Chief Justice gave more structure to his understanding of the relationship of God and the state, and the role the monument was intended to play in conveying that message. He explained that the Judeo–Christian God reigned over both the church and the state in this country, and that both owed allegiance to that God. In other words, the Chief Justice described essentially a vertical or standing triangle, with God at the top as the sovereign head, and with the state and the church, side-by-side, forming the base under God.

The Chief Justice also explained at trial how his design and placement of the monument reflected this understanding of the relationship of God and the state. His design concerns were religious rather than secular in that the quotations were placed on the sides of the monument instead of on its top because, in keeping with his religious belief, these statements were the words of man and thus could not be placed on the same plane with the Word of God. Similarly, he rejected the addition, alongside the Ten Commandments monument, of a monument containing Rev. Dr. Martin Luther King, Jr.'s "I Have a Dream" speech, not for secular reasons but because the speech was not "the revealed law of God."

The Ten Commandments monument, as the Chief Justice made clear both at the unveiling ceremony and at trial, is a granite reminder to Alabama judges and justices and all other state citizens of the ultimate sovereignty of the Judeo–Christian God over both the state and the church, and of how all men and women should, therefore, look to God as the ultimate source of the moral foundation of all the laws of this country; for, it was God, and not man or the state, that gave us the Ten Commandments.

the issue of the plaintiffs' standing in this case.

Chief Justice Moore's non-secular purpose is also evident from the monument itself. To be sure, "The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact." *Stone v. Graham*, 449 U.S. 39, 41, 101 S.Ct. 192, 194, 66 L.Ed.2d 199 (1980) (per curiam). But, as the evidence in this case more than adequately reflected, the Ten Commandments have a secular aspect as well. Experts on both sides testified that the Ten Commandments were a foundation of American law, that America's founders looked to and relied on the Ten Commandments as a source of absolute moral standards. The second tablet, of course, is entirely secular—from "Thou shalt not kill" to "Thou shalt not covet"—but the first tablet also has secular aspects. As the Chief Justice pointed out in his speech unveiling the monument, Samuel Adams gave a speech, the day before the signing of the Declaration of Independence, referring to the King as a false idol, alluding to the Commandment that "Thou shalt have no other Gods before me."

While the secular aspect of the Ten Commandments can be emphasized, this monument leaves no room for ambiguity about its religious appearance. Its sloping top and the religious air of the tablets unequivocally call to mind an open Bible resting on a lectern. While the quotations on the monument's sides are non-Biblical, they still speak solely to non-secular matters, that is, to the importance of religion and the sovereignty of God in our society; these non-Biblical quotations are physically below and not on the same plane with the Biblical one. Further, there is the ineffable but still overwhelming sacred aura of the monument. As the court observed earlier, it was not surprising to learn that visitors and court employees found the monument to be an appropriate, and even compelling, place for prayer.

The only way to miss the religious or non-secular appearance of the monument would be to walk through the Alabama State Judicial Building with one's eyes closed.

The monument in the Alabama State Judicial Building is, therefore, dramatically different from other Ten Commandments displays in other government buildings and on other government land across the country. It is different from such displays as: (1) Moses, among other historical lawgivers, holding two blank tablets on the East Portico of the United States Supreme Court Building; (2) a carving of two tablets with the numbers I through X on the entrance door to the United States Supreme Court's courtroom; (3) a pylon in front of the E. Barrett Prettyman Building in Washington D.C. with (among other things) two tablets engraved with Hebrew writing; (4) two blank tablets at the feet of the Spirit of Justice statue in the United States Justice Department Building; and (5) a mural in the Pennsylvania Supreme Court courtroom with Moses carving the Ten Commandments and a full version of the text of the Ten Commandments. In each of these displays, the Ten Commandments are situated in a secular context and the secular nature of the display is apparent and dominant.

In a mural on the United States Supreme Court building, the Ten Commandments are displayed as two blank tablets, held by Moses sitting amongst many other historical lawgivers. The Commandments displayed on the door to the Supreme Court's courtroom are so small as to be almost unnoticeable, are among many other decorations such as a lion's head and a head of wheat, and are simply two tablets containing the Roman numerals I through X. The Ten Commandments on the pylon in front of the E. Barrett Prettyman building are two small tablets, with part of the

Ten Commandments in Hebrew, as part of a larger display representing freedom of religion, freedom of the press, and freedom of speech. On a second side of the pylon are a similar series of carvings representing criminal law and the protections of due process, and on the third side are non-religious excerpts from the Declaration of Independence, the preamble to the Constitution, and the Fifth Amendment. Just as those held by Moses on the United States Supreme Court building, the tablets at the feet of the Spirit of Justice statue in the Department of Justice building, a building closed to the public since at least the late 1970's, are blank. Similar to those on the door to the Supreme Court's courtroom, they are so dominated by their surroundings (in this case, the statue) as to draw little attention. Finally, the mural in the Pennsylvania Supreme Court courtroom is one of many similar murals in that room, including murals featuring William Blackstone and the Code of Justinian.

The Chief Justice's monument is even different from those Ten Commandments displays found by other courts to violate the Establishment Clause in that the non-secular purpose and appearance of the Chief Justice's monument is much more apparent. For example, in *Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 768–69 (7th Cir.2001), *cert. denied*, 534 U.S. 1162, 122 S.Ct. 1173, 152 L.Ed.2d 117 (2002), the Seventh Circuit Court of Appeals addressed a monument with the Ten Commandments and Bill of Rights placed side-by-side, designed "to honor our history by reminding society of its core values and to honor our legal tradition since several of our secular laws are parallel to the Ten Commandments." *Id.* at 771. Similarly, in *Books v. City of Elkhart*, 235 F.3d 292, 296 (7th Cir.2000), *cert. denied*, 532 U.S. 1058, 121 S.Ct. 2209, 149 L.Ed.2d 1036 (2001), the Seventh Circuit confronted a monument with a large version of the Ten Commandments, placed by the Fra-

ternal Order of Eagles, seeking to provide troubled youths with a non-sectarian and non-coercive code of conduct. *Id.* at 294. This case is not as difficult as those in which the evidence reflected that the Ten Commandments display at issue had an arguably secular, historical purpose, for the evidence here does not even begin to support that conclusion, nor does the evidence support the conclusion that the Ten Commandments were displayed as sort of a secular moral code. The Chief Justice's words unequivocally belie such purposes.

■ This case, indeed, is unique in that, under not only the *Lemon* test, but also under the test proposed by some of *Lemon's* most vocal critics on the United States Supreme Court, the Chief Justice's placement of the Ten Commandments monument in the Alabama State Judicial Building would be unconstitutional. In *County of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), Justice Kennedy, writing for himself and Justices Rehnquist and Scalia, two of *Lemon's* strongest critics, suggested that religious endorsement was not enough to establish an Establishment Clause violation, that there must be more, such as "proselytization" or "coercion." *Id.* at 660, 109 S.Ct. at 3136–37 (Kennedy, J., concurring in part and dissenting in part). As he explained, "coercion need not be a direct tax in aid of religion or a test oath. Symbolic recognition of accommodation of religious faith may violate the Clause in an extreme case. I doubt not, for example, that the Clause forbids a city to permit the permanent erection of a large Latin cross on the roof of city hall. This is not because government speech about religion is *per se* suspect, as the majority would have it, but because such an obtrusive year-round religious display would place the government's weight behind an obvious effort to prosely-

tize on behalf of a particular religion." *Id.* at 661, 109 S.Ct. at 3137.

Justice Kennedy's proselytization test is met here. Both in appearance and in stated purpose, the Chief Justice's Ten Commandments monument is an "extreme case"; it is nothing less than "an obtrusive year-round religious display" installed in the Alabama State Judicial Building in order to "place the government's weight behind an obvious effort to proselytize on behalf of a particular religion," the Chief Justice's religion. *Id.*

### 2.

That the Ten Commandments monument's primary effect advances religion is also self-evident. To satisfy the second prong of the *Lemon* test, the challenged practice must have a "principal or primary effect ... that neither advances nor inhibits religion." *Lemon,* 403 U.S. at 612, 91 S.Ct. at 2111. In evaluating practices under this prong, the United States Supreme Court has "paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion." *County of Allegheny v. ACLU, Greater Pittsburgh Chapter,* 492 U.S. 573, 592, 109 S.Ct. 3086, 3100, 106 L.Ed.2d 472 (1989). When attempting to define "endorsement," the Court likened it to "conveying or attempting to convey a message that religion or a particular religious belief is *favored* or *preferred,*" *id.* at 593, 109 S.Ct. at 3101 (citation omitted) (emphasis in original), or to "promot[ing] one religion or religious theory against another or even against the militant opposite." *Id.* (citation omitted).

This endorsement test is objective in nature. *See, e.g., Lynch v. Donnelly,* 465 U.S. 668, 693–94, 104 S.Ct. 1355, 1370, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring) ("[W]hether a government activity communicates endorsement of religion is not a question of simple historical fact. Although evidentiary submissions

may help answer it, the question is ... in large part a legal question to be answered on the basis of judicial interpretation of social facts.") The court's inquiry in this case, therefore, turns on whether a reasonable observer would perceive the practice in question as endorsing religion. *See Allegheny,* 492 U.S. at 630, 109 S.Ct. at 3121 (O'Connor, J., concurring).

The parties disagree as to what evidence should be considered by the court in applying the "reasonable observer" standard. The proper application of the endorsement test, and, specifically, what information a "reasonable observer" would possess, was addressed by Justices O'Connor, Stevens, and Scalia in *Capitol Square Review & Advisory Board v. Pinette,* 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). Justice Stevens would broadly extend the reasonable observer concept "to the universe of reasonable persons and ask whether some viewers of the religious display would be likely to perceive a government endorsement." *Id.* at 800 n. 5, 115 S.Ct. at 2466 n. 5 (Stevens, J., dissenting). Justice O'Connor's reasonable observer, on the other hand, would be more informed, "similar to the 'reasonable person' in tort law," and "must be deemed aware of the history and context of the community and forum in which the religious display appears." *Id.* at 779–80, 115 S.Ct. at 2455 (O'Connor, J., concurring in part and concurring in the judgment). Finally, Justice Scalia refused to adopt either version of the endorsement test, instead finding it "significant that [in *Lamb's Chapel v. Center Moriches Union Free School District,* 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993)] we referred only to what would be thought by 'the community'—not by outsiders or individual members of the community uninformed about the school's practice." 515 U.S. at 765, 115 S.Ct. at 2448 (Scalia, J.). Justice Scalia further noted that some uninformed community members *"might* leap to the erroneous

conclusion of state endorsement. But ... erroneous conclusions do not count." *Id.* (emphasis in original).

■ Given Justice Scalia's understanding of *Lamb's Chapel*, it is evident that the Court generally has considered community perceptions of the challenged practice to be determinative, rather than the perceptions of "some members" or other general observers. Thus, it appears that Justice O'Connor's view of the reasonable observer, who "must be deemed aware of the history and context of the community and forum in which the religious display appears," *id.* at 780, 115 S.Ct. at 2455, most closely comports with prior Court precedent. As such, the court will consider whether the monument has the impermissible effect of endorsing religion with respect to a "reasonable observer" aware of the history and context of the community and forum in which the monument appears.

For purposes of this case, the import of that awareness is clear. A reasonable observer would know that the Chief Justice ran as the "Ten Commandments Judge" during his campaign for Chief Justice, that the Chief Justice placed the monument in the Judicial Building rotunda to fulfill his campaign promise "to restore the moral foundation of law," and that, as the Chief Justice repeatedly emphasized at the unveiling, the monument "serves to remind ... that in order to establish justice we must invoke 'the favor and guidance of almighty God.'" That reasonable observer would also know that the Judicial Building rotunda is not a public forum, and that other groups may not place their own displays in the rotunda. On the other hand, the court does not impute to a reasonable observer any knowledge of the Chief Justice's relationship with Coral Ridge Ministries or the numerous speeches, television and radio appearances he has given over the past two years; though, given that the

Chief Justice is a state official, that the monument is in a state building, and that the Chief Justice's relationship with Coral Ridge has been open and extensive, a reasonable argument could be advanced that these should be imputed as well. Even with this limited knowledge, however, the court concludes that a reasonable observer would view the monument's primary effect as an endorsement of religion.

As discussed above, the monument's primary feature is the Ten Commandments, an "undeniably ... sacred text," *Stone v. Graham,* 449 U.S. 39, 41, 101 S.Ct. 192, 194, 66 L.Ed.2d 199 (1980), carved as tablets into the top of the monument. *See Indiana Civil Liberties Union v. O'Bannon,* 259 F.3d 766, 772 (7th Cir.2001) (recognizing additional religious significance when the Commandments are presented as tablet-shaped blocks), *cert. denied,* 534 U.S. 1162, 122 S.Ct. 1173, 152 L.Ed.2d 117 (2002). The monument's sloping top and the religious air of the tablets unequivocally call to mind an open Bible resting on a lectern. While the quotations on the monument's sides are non-Biblical, the fact that they have been edited so as to emphasize the importance of religion and the sovereignty of God in our society fails to diminish, and even amplifies, the ineffable but still overwhelming holy aura of the monument. As the Chief Justice himself stated at the monument's unveiling ceremony, these quotations were not included to serve as "history, [or] historical documents. All history supports the acknowledgment of God. You'll find no documents surrounding the Ten Commandments because they stand alone as an acknowledgment of that God that's contained in our pledge, contained in our motto, and contained in our oath." No part of the monument itself, nor sign, nor other decoration in the rotunda, in any way emphasizes the potentially secular nature of the Commandments. *See, e.g., Allegheny,* 492 U.S. at 598, 109 S.Ct. at 3103 (explain-

ing that the effect of a creche, which is capable of communicating a religious message, turns on its setting). Thus, a reasonable observer, viewing this monument installed by the "Ten Commandments Judge" as a whole, would focus on the Ten Commandments, would find nothing on the monument to de-emphasize its religious nature, and would feel as though the State of Alabama is advancing or endorsing, favoring or preferring, Christianity.

The court also finds nothing in "the history of the monument's placement and maintenance as well as the physical characteristics of the monument and of the surrounding area," *Books v. City of Elkhart*, 235 F.3d 292, 294 (7th Cir.2000), that would change the court's view that the monument endorses religion. *See also Allegheny*, 492 U.S. at 578–87, 109 S.Ct. at 3093–99 (discussing the challenged monument, its placement, and the surrounding area). In this case, the Chief Justice installed the monument to fulfill a campaign promise to "restore the moral foundation of law." The monument stands alone in the rotunda, in front of a large picture window with a waterfall in the background, with no other objects to provide a different "focal point" of a viewer's attention. *See id.* at 598, 109 S.Ct. at 3103 (distinguishing the Court's opinion in *Allegheny* from its holding in *Lynch* because the *Lynch* display "composed a series of figures and objects, each group of which had its own focal point"). While the rotunda does contain two other plaques, these plaques are much smaller and are over seventy feet away with no sign to indicate that they are connected to or related to the monument in any way. Finally, the rotunda is not an open forum; no other group may install a different monument or plaque in the rotunda without the Chief Justice's permission. Taken together, this history and the physical characteristics of the monument and its surrounding area do nothing to mitigate the monument's effect of endorsing religion, of showing that Christianity is the "favored or preferred" religion of the state of Alabama.

The Ten Commandments monument, viewed alone or in the context of its history, placement, and location, has the primary effect of endorsing religion. As such, the monument violates the second prong of the *Lemon* test, and it therefore violates the Establishment Clause.[2]

---

2. While not argued by the plaintiffs, the court is concerned that Chief Justice Moore's involvement with Coral Ridge Ministries, a Christian media outlet, violates the third, entanglement prong of the *Lemon* test. Aside from its being the only media outlet to record the night-time placement of the monument in the Alabama State Judicial Building, Coral Ridge has used the Chief Justice's name and his installation of the Ten Commandments monument to raise funds for not only his defense but also its own evangelical purposes. For example, Coral Ridge uses a picture of the monument to raise money for the Chief Justice's legal defense and, at the same time, to raise money for its own work. A fund-raising letter from Coral Ridge President Dr. James Kennedy included a donor-response form which read, in part, "I want to help provide for Justice Moore's and the Ten Commandments' legal defense. Also, use my gift

to continue sharing the life-transforming Gospel, through new editions of *The Coral Ridge Hour* and all the ongoing work of Coral Ridge Ministries." In another fund-raising letter, Kennedy wrote, "Please pray and send your most generous possible gift to help us aid in the judge's defense and continue all of the outreaches of the ministry together." Coral Ridge has also used the Chief Justice and the monument as a subject of many of its television and radio programs and has, a number of times, highlighted the Chief Justice's lawsuit in its newsletter "Impact." Coral Ridge even uses the Chief Justice to raise funds on its website: "If you would like to help with the $200,000 Ten Commandments Defense fund and also enable Dr. Kennedy to continue the work of this ministry, send your gift." Additionally, while the Chief Justice is a state official, sued for his placement of a monument in a state building, the State of Alabama

## C.

Chief Justice Moore contends that the plaintiffs err in their application of the *Lemon* test.

### 1.

The Chief Justice contends that the United States Supreme Court's historical analysis in *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), rather than its test from *Lemon*, should be applied to determine the outcome of this case. In *Marsh*, the Court concentrated on the very specific nature of the facts in that case to conclude that the Nebraska legislature's practice of opening each session with a non-sectarian prayer did not violate the Establishment Clause. *See Marsh*, 463 U.S. at 786, 103 S.Ct. at 3333. Specifically, the Court focused on the fact that

> "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country. From colonial times through the founding of the Republic and ever since, the practice

of legislative prayer has coexisted with the principles of disestablishment and religious freedom."

*Id.* The Court also noted that the Continental Congress itself adopted the procedure of opening its sessions with a prayer, *id.* at 787, 103 S.Ct. at 3333–34, and found that "Clearly the men who wrote the First Amendment Religion Clauses did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress." *Id.* at 788, 103 S.Ct. at 3334. This "unique history" of legislative prayer was of central importance to the Court in making its decision. *Id.* at 791, 103 S.Ct. at 3335.

A comparison of *Lemon* and *Marsh*, however, reveals that this court need not choose between two competing and mutually exclusive tests. Thus, the court cannot accept the Chief Justice's argument that the historical analysis from *Marsh* has replaced the *Lemon* test in the Supreme Court's Establishment Clause jurispru-

---

is not paying Chief Justice Moore's legal expenses; these expenses are instead being paid by a private source, Coral Ridge.

In a real sense, therefore, the installation of the monument can be viewed as a joint venture between the Chief Justice and Coral Ridge, as both parties have a direct interest in its continued presence in the rotunda. A credible argument could be made that this type of entanglement is specifically the type of "evil[ ] against which [the] Clause protects ... 'sponsorship, financial support, and active involvement of the sovereign in religious activity.'" *Committee for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 772, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973) (*quoting Walz v. Tax Comm'n*, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970)).

Admittedly, the Chief Justice denies an active relationship between himself and Coral Ridge. He contends that he has not been involved in the ministry's efforts, through the

use of his name and the publicity surrounding the monument, to raise funds for his legal defense in conjunction with efforts to raise funds for its religious projects. But the law recognizes that one cannot escape responsibility for the acts of others, taken on one's behalf, through deliberate ignorance. *Jim Walter Res., Inc. v. Allen*, 995 F.2d 1027, 1029 (11th Cir.1993) (holding that deliberate ignorance to the kind of work employee performed would not excuse management from liability for injury employee incurred on the job); *Robinson v. Jacksonville Shipyards, Inc.*, 760 F.Supp. 1486, 1530 (M.D.Fla.1991) (finding that employer could not escape liability for hostile work environment by "elect[ing] to bury its head in the sand rather than learn more about the conditions to which female employees ... were subjected"). In a very real way, then, it could be argued that Coral Ridge's religious activity is being sponsored and financially supported by the Chief Justice's installation of the monument as a government official.

dence. First, while the *Lemon* test has been criticized by a number of Supreme Court Justices, *Lemon* has not been overruled, *see Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 395 n. 7, 113 S.Ct. 2141, 2148 n. 7, 124 L.Ed.2d 352 (1993) (noting that *Lemon,* despite heavy criticism, is still good law), and a clarified (endorsement) version of the *Lemon* test is still regularly applied by the Court. *See, e.g., Zelman v. Simmons–Harris,* — U.S. —, —, 122 S.Ct. 2460, 2476, 153 L.Ed.2d 604 (2002) (O'Connor, J., concurring) ("A central tool in our analysis of cases in this area has been the *Lemon* test.... The test today is basically the same as that set forth ... over 40 years ago."); *Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290, 314, 120 S.Ct. 2266, 2282, 147 L.Ed.2d 295 (2000) ("*Lemon* ... 'guides the general nature of our inquiry in this area.' ") (citation omitted). The Eleventh Circuit, too, has continued to apply the *Lemon* test despite this criticism. *Bown v. Gwinnett County Sch. Dist.,* 112 F.3d 1464, 1468 (11th Cir.1997).

 Second, *Marsh* can be viewed as "an exception to the *Lemon* test only for such historical practice[s]" as those comparable to legislative prayer. *Jager v. Douglas County Sch. Dist.,* 862 F.2d 824, 829 n. 9 (11th Cir.1989), *cert. denied,* 490 U.S. 1090, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989); *see also Marsh,* 463 U.S. at 796, 103 S.Ct. at 3338 (Brennan, J., dissenting) (calling *Marsh* a limited exception to *Lemon* ); *but see Allegheny,* 492 U.S. at 669–70, 109 S.Ct. at 3142 (Kennedy, J., concurring in part and dissenting in part) (rejecting this view of *Marsh* ). In other words, a practice that fails any one prong of the *Lemon* test may still be found constitutional under the *Marsh* exception to the *Lemon* test. The court therefore need not, as the Chief Justice would have it, choose which of the two cases to apply. Rather, having already found the Chief Justice's installation of the monument to fail the first two prongs of the *Lemon* test, the court now turns to the question of whether the monument nevertheless can be found constitutional under *Marsh.*

As discussed above, the United States Supreme Court in *Marsh,* rather than applying the *Lemon* test, concentrated on the very specific nature of the facts in that case to conclude that the Nebraska legislature's practice of opening each session with a non-sectarian prayer did not violate the Establishment Clause. *Marsh,* 463 U.S. at 786, 103 S.Ct. at 3333; *see also County of Allegheny v. ACLU, Greater Pittsburgh Chapter,* 492 U.S. 573, 603, 109 S.Ct. 3086, 3106, 106 L.Ed.2d 472 (1989) ("*Marsh* plainly does not stand for the sweeping proposition ... that all accepted practices 200 years old and their equivalents are constitutional today."); *Edwards v. Aguillard,* 482 U.S. 578, 583 n. 4, 107 S.Ct. 2573, 2577 n. 4, 96 L.Ed.2d 510 (1987) (noting that *Lemon* had been applied in all cases, save *Marsh,* since its adoption); *Wallace v. Jaffree,* 472 U.S. 38, 63 n. 4, 105 S.Ct. 2479, 2493 n. 4, 86 L.Ed.2d 29 (1985) (Powell, J., concurring) (stating that the *Marsh* holding was "based upon the historical acceptance of the practice that had become 'part of the fabric of our society.' ") (citation omitted). The Chief Justice argues that the case at hand has similarly unique facts and should therefore be found constitutional under this exception to the *Lemon* test.

The Chief Justice contends that, under *Marsh,* the monument is constitutional because, as he has written in his briefs to the court, "judges throughout our nation's history have acknowledged the moral foundation of law and, indeed, have depended upon it in reaching their decisions." He points to an uninterrupted history, from as early as 1819 to today, in which courts "interacted with, relied upon, or otherwise discussed the moral foundation of the law

[in their decisions]." As such, the Chief Justice contends, his reference to "God and to God's law on the monument do not render it unconstitutional." The Chief Justice also argues that the acknowledgment of God made by this monument is no different from the acknowledgments of God appearing on United States currency, in the United States motto, and at the opening of court sessions. Basically, the Chief Justice argues that the monument's acknowledgment of God, like the legislative prayer upheld in *Marsh,* is part of our nation's history.

Additionally, the Chief Justice has presented evidence of numerous displays of the Ten Commandments in judicial buildings and other government buildings in Washington, D.C. The Chief Justice argues that the existence of these Ten Commandments displays demonstrates a history of such displays which validates the constitutionality of his own display under *Marsh.* The most significant of these displays, discussed previously, are: (1) Moses, among other historical lawgivers, holding two tablets on the East Portico of the United States Supreme Court Building; (2) a carving of two tablets with the numbers I through X on the entrance door to the United States Supreme Court's courtroom; (3) a pylon in front of the E. Barrett Prettyman Building in Washington D.C. with (among other things) two tablets carved with Hebrew writing; (4) two blank tablets at the feet of the Spirit of Justice statue in the United States Justice Department Building; and (5) a mural in the Pennsylvania Supreme Court courtroom with Moses carving the Ten Commandments and a full version of the text of the Ten Commandments.

The Chief Justice's first argument, that the monument is constitutional under *Marsh* because of the historical validation provided by judicial acknowledgment in court opinions of the moral foundation of

law, and other governmental acknowledgments of God, is flawed. Even assuming the Chief Justice's contentions are true, that judges in their opinions throughout American history have recognized the moral foundation of law, it does not follow that this monument should be considered simply as part of that long history of recognition; nor does it follow that this monument is simply one in a long line of governmental acknowledgments of God. First, as discussed previously, the Chief Justice's understanding of the moral foundation of our laws flows from his beliefs that the Judeo–Christian God is the source of the church, the state, and the separation of the two, and, as a matter of not only Biblical text but American law, reigns over both. The Chief Justice has not shown that other judges have recognized this same understanding of the sovereignty of the Judeo–Christian God, and, given the Chief Justice's unique views, the court cannot assume that they did. Second, there is a significant difference between "an obtrusive year-round religious display" installed in the Alabama State Judicial Building in order to "place the government's weight behind an obvious effort to proselytize on behalf of a particular religion," *County of Allegheny v. ACLU, Greater Pittsburgh Chapter,* 492 U.S. 573, 661, 109 S.Ct. 3086, 3137, 106 L.Ed.2d 472 (1989) (Kennedy, J., concurring in part and dissenting in part), and the discussion of the moral foundation of our laws in a court's opinion, or the ceremonial recognition of God on money or at the opening of court.

Challenges under the Establishment Clause have often turned on subtle but significant differences. A creche standing alone is constitutionally different from a creche incorporated into a larger holiday display, *compare id.* at 578–79, 109 S.Ct. at 3093 (holding unconstitutional a creche standing alone) *with Lynch v. Donnelly,* 465 U.S. 668, 687, 104 S.Ct. 1355, 1366, 79

L.Ed.2d 604 (1984) (finding constitutional a creche incorporated as part of a larger holiday display), and legislative prayer is significantly different from prayer at a high-school graduation, *compare Marsh,* 463 U.S. at 795, 103 S.Ct. at 3338 (holding non-sectarian legislative prayer constitutional) *with Lee v. Weisman,* 505 U.S. 577, 599, 112 S.Ct. 2649, 2661, 120 L.Ed.2d 467 (1992) (finding prayers at high school graduation to be unconstitutional). Similarly, "ceremonial deisms," such as legislative prayers or opening Court sessions with "God save the United States and this honorable Court," are different from public acknowledgments of a sectarian God. *Compare Allegheny,* 492 U.S. at 630, 109 S.Ct. at 3120–21 (O'Connor, J. concurring) (noting that legislative prayer solemnizes public occasions and expresses hope in the future) *with id.* at 603, 109 S.Ct. at 3106 (finding an obvious difference between creche displays and references to God in the National Motto and the Pledge of Allegiance). As such, neither an unbroken history of judicial recognition of the moral foundation of law, nor ceremonial acknowledgments of a non-sectarian God, both of which are very different from the Chief Justice's permanent, prominent granite monument to the sovereignty of God, are enough to find the Chief Justice's actions constitutional under the *Marsh* exception.

Additionally, while the Chief Justice has brought other displays of the Ten Commandments to the court's attention, he has not demonstrated that any of the "unique" circumstances from *Marsh* exist in this case. First, the Chief Justice has not shown that members of the Continental Congress displayed the Ten Commandments in their chambers, nor that they directly approved of its public display by the government. Second, public, governmental displays of the Ten Commandments, installed with the purpose of proselytization and having a religious effect, are not "deeply embedded in the history and

tradition of this country," *Marsh,* 463 U.S. at 786, 103 S.Ct. at 3333; indeed, most date from the twentieth century. Thus, the Chief Justice has failed to show that similar displays are common or even generally accepted in this country.

Finally, even if, for the sake of argument, history could be read to support the Chief Justice's contention that Ten Commandments displays in government buildings have been a sufficiently historical part of the fabric of our society, this tradition would fall far short of providing a constitutional basis for the Chief Justice's Ten Commandments monument. No other Ten Commandments display presents such an extreme case of religious acknowledgment, endorsement, and even proselytization. In other words, if there is a Ten Commandments display tradition in this country, it is definitely not the tradition embodied by the Chief Justice's monument.

Because no historical background, comparable to that found in *Marsh,* exists to validate the constitutionality of Chief Justice Moore's Ten Commandments monument, the court finds that the monument is not constitutional under the *Marsh* exception to the *Lemon* test.

### 2.

Chief Justice Moore faults not only the plaintiffs but the United States Supreme Court for failing to understand the historical relationship between God and the state, a relationship he believes to be embodied by the Establishment Clause and which would allow the presence of his Ten Commandments monument in the Alabama State Judicial Building.

▪ As mentioned above, at trial the Chief Justice explained at length his understanding of the relationship between God and the state. In the Chief Justice's understanding, the Judeo–Christian God is

sovereign over both the church and the state in this country, and both owe allegiance to that God. In descriptive terms, God, as the sovereign head, is at the top of a hierarchical vertical triangle; under God are the state and the church, standing next to one another and forming the base of the triangle. The Chief Justice maintains that this understanding of the relationship between God and the state is dictated not only by Biblical text but by the First Amendment itself.

As the Chief Justice explained at trial, relying in large measure on his dissenting opinion in *Yates v. El Bethel Primitive Baptist Church*, —— So.2d ——, 2002 WL 31270278 (Ala.2002) (Moore, C.J., dissenting), the separation of church and state is "most vividly illustrated by the Old Testament nation of Israel, where institutional lines were drawn so clearly that the chief of state, the king, could not even come from the same family or tribe as the chief ecclesiastical officer, the high priest." *Id.* at *18. The Chief Justice gave the examples of: "King Uzziah, son of Amaziah, [who] was stricken with leprosy when he presumed upon the role of the priests in burning incense unto the Lord," and "Saul, the first king of Israel, [who] trespassed upon the jurisdiction of the church by making a burnt offering instead of waiting for Samuel, the priest, to perform his duty." *Id.* (*citing* II *Chronicles* 26:16–21 (King James); I *Samuel* 13:13–14 (King James)). Thus, the Bible dictates the Chief Justice's understanding of the relationship between God and the state because, "While both the priest and the king were under the law of God, the role of civil government was separated from the worship of God." *Id.* Jesus, too, according to the Chief Justice, explicitly recognized this separation when he said "Render therefore unto Caesar the things which are Caesar's; and unto God the things that are God's." *Id.* (*citing Matthew* 22:21 (King James)).

The Chief Justice also believes that his specific understanding of the relationship between God and the state is embodied by the First Amendment. The Chief Justice quotes Thomas Jefferson's "Bill For Establishing Religious Freedom," "that *Almighty God hath created the mind free*, and manifested his supreme will· that· free it shall remain," *El Bethel*, —— So.2d ——, 2002 WL 31270278, *17 (emphasis added by the Chief Justice), for the proposition that "even Thomas Jefferson recognized that a separation between church and state existed because 'Almighty God' was sovereign over both institutions." *Id.* The Chief Justice also quotes James Madison's "Memorial and Remonstrance": "It is the duty of every man to render to the Creator such homage, and such only, as he believes to be acceptable to him. This duty is precedent both in order of time and degree of obligation, to the claims of Civil Society. Before ·any man can be considered as a member of Civil Society, he must be considered as a subject of the Governor of the Universe ..." *Id.* at *22 (*quoting* II *The Writings of James Madison* 184–85) (Gaillard Hunt, ed., G.P. Putnam's Sons 1901). This language leads to the Chief Justice's conclusion that "Madison explicitly recognized that maintaining a 'separation' in no way meant to separate from civil government a belief in the sovereignty of God. Indeed, the very concept of separation mandates a recognition of a sovereign God." *Id.* at *21. The Chief Justice uses these examples from Jefferson and Madison, as well as earlier examples in English history, to support his belief "that the recognition of the sovereignty of God is the very source of the principle of the separation of church and state." *Id.* at *22

Indeed, in the Chief Justice's view, it is the Judeo–Christian God, through the Biblically dictated separation of church and state, who gives Americans the freedom of conscience to believe in whatever faith

they choose. Americans are free to worship other Gods only because the Judeo–Christian God, and the Judeo–Christian God alone, allows for freedom of conscience. Because all other Gods, in the Chief Justice's view, do not allow for freedom of conscience, we, as Americans, would not have such freedom if another God were placed over the church and state under our governmental framework.[3]

The court appreciates that, *as a matter of conscience*, one may believe that the Judeo–Christian God is sovereign over the state. In fact, the court understands that it is just this type of belief that the Free Exercise clause and the Establishment Clause are meant to protect. Thus, the court stresses that it is *not* disagreeing with Chief Justice Moore's beliefs regarding the relationship of God and the state. Rather, the court disagrees with the Chief Justice to the extent that it understands him to be saying that, *as a matter of American law*, the Judeo–Christian God must be recognized as sovereign over the state, or even that *the state* may adopt that view. This is an opinion about the structure of American government, rather than a matter of religious conscience, that the court feels fully comfortable refusing to accept.

As an initial matter, the court understands how, if it were to adopt the Chief Justice's understanding of the First Amendment as a matter of *law*, his place-

ment of the monument in the Alabama State Judicial Building would not violate the Establishment Clause. Under the Chief Justice's view, the Judeo–Christian God is the real, and even divine, source for the separation of church and state under the First Amendment. As such, that God, or the belief in that God, cannot be separated from the state, and must not be separated from the state lest we lose our freedom of conscience to worship as we choose; the church as an entity is all that must be separated from the state. Because the Chief Justice's Ten Commandments monument is not a church, and does not coerce people into worshiping God in a certain manner, it does not violate the Establishment Clause as the Chief Justice understands it.

 The court, however, rejects the Chief Justice's suggested *legal* understanding of the relationship between God and the state for a number of reasons. First and foremost, the Chief Justice's belief that American law embraces the sovereignty of God over the state has no support in the text of the First Amendment. The First Amendment simply states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Nowhere does the Constitution or the First Amendment recognize the sovereignty of any God, Judeo–Christian or not, or describe the rela-

---

3. Some might disagree, even strongly, with the Chief Justice's view that other, non-Judeo-Christian, Gods are not tolerant, and that the Judeo–Christian God, at least as the Judeo–Christian God has been understood over the centuries, is tolerant. As one legal scholar has put it,

> "The Western religions—Christianity, Judaism, and Islam—all rest on principles discouraging or even forbidding coercion in persuading nonbelievers to believe. These principles, to be sure, have often been honored in the breach, although a good deal less often than some may think. Even the

Inquisition, to take a prominent example, was never aimed at nonbelievers, only at Christians considered heretics. Most Eastern religions, too, abhor coercion and violence. The fact, for example, that violence has often marked the politics of predominantly Buddhist Sri Lanka does not alter the fundamental nonviolent teaching of that tradition. It means only that the teaching of Buddhism, like similar teachings in other faiths, is sometimes disobeyed by morally frail humans."

Stephen L. Carter, *God's Name in Vain* 158 (2000).

tionship between God and the state. In fact, this country's founding documents support the idea that it is from the people, and not God, that the state draws its powers. As every American schoolchild knows, the Declaration of Independence states that "governments are instituted among Men, deriving their just powers from the consent of the governed," and the Constitution begins with that immortal phrase, "We the People of the United States, in Order to form a more perfect Union ... do ordain and establish this Constitution for the United States of America." Hence, the Chief Justice has no textual support, in either the Constitution as a whole or the First Amendment itself, for his legal understanding of the relationship between God and the state, and the court must therefore reject that understanding. Second, the Chief Justice's understanding of this relationship has no support in Supreme Court law. No Supreme Court decision and, the court believes, no Supreme Court Justice, has suggested that the First Amendment itself actually incorporates the notion of a Judeo–Christian God as the sovereign head of this nation. The First Amendment does not elevate one religion above all others, but rather it places all religions on par with one another, and even recognizes the equality of religion and non-religion. *See Allegheny*, 492 U.S. at 590, 109 S.Ct. at 3099 ("Perhaps in the early days of the Republic these words were understood to protect only the diversity within Christianity, but today they are recognized as guaranteeing religious liberty and equality to 'the infidel, the atheist, or the adherent of a non-Christian faith such as Islam or Judaism.' ") (*quoting Wallace v. Jaffree*, 472 U.S. 38, 52, 105 S.Ct. 2479, 2487, 86 L.Ed.2d 29 (1985)). The Chief Justice's understanding of the First Amendment, however, would discriminate among religions; in fact, it would recognize only Christianity as a "religion" and would rele-

gate Hinduism or Islam, among others, to the lesser status of a "faith." Roy S. Moore, *Religion in the Public Square*, 29 Cumb. L.Rev. 347, 356–57 (1998/1999) ("By leaving religion undefined, the Court has opened the door to the erroneous assumption that, under the Establishment Clause, religion could include Buddhism, Hinduism, Taoism, and whatever might occupy in man's life a place parallel to that filled by God, or even Secular Humanism, which might be defined as man's belief in his own supremacy and sufficiency."). At trial, the Chief Justice reiterated his belief that only Christianity meets the First Amendment definition of religion, and repeatedly called any other creed a "faith," rather than a religion. As such, the court must also reject the Chief Justice's legal understanding of the First Amendment concept of religion for its lack of support in Supreme Court precedent.

To be sure, some Justices have been more tolerant than others of state "acknowledgment" of various religions; but none has gone so far as to say that the state should or even may acknowledge one religion—that is, Christianity—as the basis on which all other religious faiths are free to worship as they choose. Were the state to do so, it would be engaging in proselytization on behalf of a particular religion, which even those Justices who read the Establishment Clause more narrowly would prohibit. *See, e.g., Allegheny*, 492 U.S. at 661, 109 S.Ct. at 3137 (Kennedy, J., concurring in part and dissenting in part) (stating that the display of a large Latin cross on the roof of city hall would violate the Establishment Clause because it "would place the government's weight behind an obvious effort to proselytize on behalf of a particular religion"). By adopting, as a matter of law, the view that the Judeo–Christian God is the authority behind the First Amendment, the state would also be embracing a particular reli-

gion, again in complete violation of the Establishment Clause. *See, e.g., Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 401, 113 S.Ct. 2141, 2151, 124 L.Ed.2d 352 (1993)(Scalia, J., concurring) ("I would hold, simply and clearly, that giving Lamb's Chapel nondiscriminatory access to school facilities cannot violate [the Establishment Clause] because it does not signify state or local embrace of a particular religious sect."). Even under the most narrow readings of the Establishment Clause, then, while the Chief Justice is free to keep whatever religious beliefs he chooses, *the state* may not acknowledge the sovereignty of the Judeo–Christian God and attribute to that God our religious freedom.

Third, the court notes that it is hard to separate the Chief Justice's religious beliefs—that he may possess as a matter of conscience—from his legal beliefs—that the court must disagree with—because the Chief Justice's legal understanding of the relationship between God and the state is identical to his religious understanding of that relationship. Indeed, his monument-unveiling speech in the Alabama State Judicial Building would have been as (if not more) appropriate as a Ten Commandments monument-dedication ceremony in a church. One could easily imagine an evangelist preacher giving a sermon about the "truth ... that in order to establish justice, we must invoke 'the favor and guidance of Almighty God,'" and ending with his hope that "this day [may] mark the restoration of the moral foundation of law to our people and the return to the knowledge of God in our land." The Chief Justice's understanding of the relationship between God and the state comes uncomfortably too close to the adoption of "a government of a state by the immediate direction or administration of God," *Webster's Third New International Dictionary* 2370 (1976), that is, a "theocracy," *id.,* albeit in the Chief Justice's mind a toler-

ant one. The court must unequivocally reject the adoption of an approach that could lead to that outcome.

### 3.

■ Chief Justice Moore contends that the plaintiffs, and even the United States Supreme Court, have failed to give an appropriate definition of religion; he maintains that an Establishment Clause challenge cannot be resolved with fidelity to the original intent of the framers without adopting a definition of the word "religion" that comports with his understanding of the Establishment Clause.

■ By the Chief Justice's definition, as stated at trial in reference to his law review article, "religion" means nothing more than "the duties we owe to our Creator and the manner of discharging those duties." Hon. Roy S. Moore, *Religion in the Public Square,* 29 Cumb. L.Rev. 347, 352 (1998/1999). Relying on this definition, the Chief Justice views the Establishment Clause as simply preventing government from establishing the duties one owes to God and the manner of discharging those duties. This understanding, according to his testimony at trial, "is derived from the Judeo–Christian view of the sovereignty of God, not the Buddhist view of God or the Hindu view of God, or the Taoist view of God, or the secular humanist view of God." Similarly, the Chief Justice has written that,

"By leaving religion [seemingly] undefined, the [Supreme] Court has opened the door to the erroneous assumption that, under the Establishment Clause, religion could include Buddhism, Hinduism, Taoism, and whatever might occupy in man's life a place parallel to that filled by God ... In such a case, God and religion are no longer distinguished in meaning, permitting the First Amendment to be used to exclude the very object it was meant to protect,

namely the sovereignty of God over civil government."

*Id.* at 356–57.[4] In short, his definition of religion would permit the First Amendment to do what he believes it was intended to do: "to protect ... the sovereignty of God over civil government," *id.*, and sovereignty of the Judeo–Christian God only.[5]

The court, for several reasons, rejects the Chief Justice's invitation to define the term "religion." First and foremost, to adopt the Chief Justice's definition of religion would be to reject explicitly the precedent established by a number of Supreme Court cases, from *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), to *Zelman v. Simmons–Harris*, —— U.S. ——, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002), which would have been decided differently under the Chief Justice's proposed definition. Without cataloguing the many cases that would be re-solved differently given the Chief Justice's definition of religion, the court will discuss a number of examples to illustrate this point.

Under the Chief Justice's definition of religion, religious display cases, such as *County of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), would be decided differently. In *Allegheny*, the court found unconstitutional the display of a creche in a government building, *id.* at 579, 109 S.Ct. at 3093, an outcome that would certainly change if the Establishment Clause prohibited no more than an Establishment of "the duties we owe to our Creator and the manner of discharging those duties." School prayer cases, too, such as *Wallace v. Jaffree*, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985), or *Santa Fe Independent School District v. Doe*, 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000), would be resolved differently. In

4. At trial, the Chief Justice testified that he would add the word "seemingly" to this statement from his law review article.

5. While the court agrees with the Chief Justice that an understanding of "religion" for First Amendment purposes must constitute more than just the acknowledgment of God, it is not inclined to agree with his semantic distinction between "faith" and "religion." In *Webster's Third New International Dictionary* 816 (1976), "faith" is defined as "1(a): the act or state of wholeheartedly and steadfastly believing in the existence, power, and benevolence of a supreme being ...; belief and trust in and loyalty to God; (b)(1): an act or attitude of intellectual assent to the traditional doctrines of one's religion; orthodox religious belief." In that dictionary, *id.* at 1918, "religion" is defined as "1: the personal commitment to and serving of God or a god with worshipful devotion, conduct in accord with divine commands esp[ecially] as founded in accepted sacred writings or declared by authoritative teachers, a way of life recognized as incumbent on true believers, and typically the relation of oneself to an organized body of believers."

Under these definitions, Muslims, for example, would call Islam both their "faith" (they believe in the existence of a supreme being) and their "religion" (they have a personal commitment to a God). Under the Chief Justice's understanding and definition of religion, however, Islam is not a "religion," even though it clearly prescribes duties owed to the Creator and the manner of discharging those duties, but it is a "faith." Islam is not a religion under the Chief Justice's views because Muslims do not worship the Judeo–Christian God. While Muslims have a personal commitment to a God, they do not have a personal commitment to the God of the founders; or, using the Chief Justice's definition of religion, Muslims owe duties to their creator and have ways of discharging those duties, but they do not owe the same duties to their creator nor do they have the same manner of discharging those duties as the founders. The court cannot accept a definition of religion that would lead to such a conclusion.

Indeed, the Chief Justice's definition of religion proves, if anything, that it is unwise, and even dangerous, to put forth, as a matter of law, *one* definition of religion under the First Amendment.

*Wallace,* the Court found unconstitutional a statute designed to return voluntary prayer to schools, 472 U.S. at 61, 105 S.Ct. at 2492; in *Santa Fe,* the Court found unconstitutional a policy of student-led prayer before football games, 530 U.S. at 317, 120 S.Ct. at 2283. Again, under the Chief Justice's limited definition of religion, both of these cases would have been decided differently as voluntary prayers cannot establish "the duties we owe to our Creator and the manner of discharging those duties."

■ By adopting the Chief Justice's definition, then, the court would not only be deciding this case, but would be implicitly overruling a number of Supreme Court cases. This it cannot do: the court is strictly bound by Supreme Court precedent; only that Court has the ability to overturn its previous decisions. *See, e.g., Jaffree v. Wallace,* 705 F.2d 1526, 1532–33 (11th Cir.1983) ("Under our form of government and long established law and custom, the Supreme Court is the ultimate authority on the interpretation of our Constitution and laws; its interpretations may not be disregarded.... If the Supreme Court errs, no other court may correct it."), *aff'd,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985); *see also Hutto v. Davis,* 454 U.S. 370, 375, 102 S.Ct. 703, 706, 70 L.Ed.2d 556 (1982) ("But unless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be."). Under current Supreme Court precedent, this court simply must decide on which side of the Establishment Clause "barrier," *Lemon,* 403 U.S. at 614, 91 S.Ct. at 2112, the Chief Justice's installation of the monument falls. It need not, and in fact cannot, accept the Chief Justice's definition of the word "religion" because, by doing so, the court would implicitly overrule a number of Supreme Court decisions.

Second, the court cannot accept the Chief Justice's proposed definition of the word "religion" because it is, simply put, incorrect and religiously offensive. The court cannot accept a definition of religion that does not acknowledge Buddhism or Islam as a religion under the First Amendment, and would in fact directly violate Supreme Court precedent by doing so. *See Allegheny,* 492 U.S. at 590, 109 S.Ct. at 3099 ("Perhaps in the early days of the Republic these words were understood to protect only the diversity within Christianity, but today they are recognized as guaranteeing religious liberty and equality to 'the infidel, the atheist, or the adherent of a non-Christian faith such as Islam or Judaism.' ") (quoting *Wallace,* 472 U.S. at 52, 105 S.Ct. at 2487).

Finally, the plaintiffs have not presented an alternate definition of religion, and the court lacks the expertise to formulate its own definition of religion for First Amendment purposes. Therefore, because the court cannot agree with the Chief Justice's definition of religion and cannot formulate its own, it must refuse the Chief Justice's invitation to define "religion."

4.

■ Noting that the Establishment Clause provides that government "shall make no law respecting an establishment of religion," Chief Justice Moore contends that the plaintiffs' challenge to the monument must fail because there is no "law" at issue here. The Chief Justice asserts that, although he put the monument in the Judicial Building as a state actor, his actions did not constitute a "law" or "law-making" for Establishment Clause purposes. The court cannot agree.

The Chief Justice placed the monument in the Judicial Building Rotunda under his authority as administrative head of Alabama's judicial system. Ala. Const. amend. 328, § 6.10 (administration); Ala.

Code § 41–10–275 (1975) (leases). His placement of the monument, therefore, has the force of law. The Chief Justice is the only person with the authority to place the monument or remove it, authority given to him by the laws of Alabama. To say that his actions in placing the monument in the Alabama Judicial Building does not constitute a "law" obfuscates the truth of the situation: the monument was placed in the Judicial Building by a state official, acting in his official state capacity, under powers granted to him by state law. *Cf. Lee v. Weisman*, 505 U.S. 577, 587, 112 S.Ct. 2649, 2655, 120 L.Ed.2d 467 (1992) ("A school official, the principal, decided that an invocation and a benediction should be given; this is a choice attributable to the State, and from a constitutional perspective it is as if a state statute decreed that the prayers must occur."). Indeed, in the Chief Justice's understanding, the Alabama Constitution affirmatively requires him to have put the monument in the rotunda. At trial, he testified: "Well, first I am pleased to present this monument. What pleased me is the fact that it represented my duty under the Constitution of the State of Alabama ... [which] says that I shall take affirmative and appropriate action to correct and alleviate any condition or situation in the administration of justice...."

Because the Chief Justice placed the monument in the Alabama State Judicial Building in his official capacity, under the authority of Alabama law, its placement falls well within the Establishment Clause's purview.

### 5.

Chief Justice Moore contends that the plaintiffs, in their application of *Lemon*, fail to draw a distinction between motive and purpose, thereby conflating his permissible "purpose" for installing the monument with his irrelevant "motive" for its installation. An example may help to elucidate this difference: if a legislator voted to support a bill to build a highway through his district, his purpose would be simply to build a highway, no matter what his underlying motive (to create jobs, please voters, etc.) may have been. The Chief Justice argues that only evidence of his purpose in erecting the monument may be considered by the court. While the court finds that the Chief Justice's distinction between "motive" and "purpose" has potential merit, that distinction is not determinative in this case.

The Supreme Court, in *Board of Education v. Mergens*, 496 U.S. 226, 249, 110 S.Ct. 2356, 2371, 110 L.Ed.2d 191 (1990) (holding the Equal Access Act requires school to allow a religious group equal access to school facilities and that the Act does not violate the Establishment Clause as so construed), provides some support for the distinction between purpose and motive: "Even if some legislators were motivated by a conviction that religious speech in particular was valuable and worthy of protection, that alone would not invalidate the Act, because what is relevant is the legislative *purpose* of the statute, not the possibly religious *motives* of the legislators who enacted [it]." (Emphasis in original). Justice O'Connor's concurrence in *Wallace v. Jaffree*, 472 U.S. 38, 74–75, 105 S.Ct. 2479, 2499, 86 L.Ed.2d 29 (1985) (finding statutes providing for voluntary school prayer unconstitutional), also instructs on the scope of the court's inquiry into the Chief Justice's intent. In *Wallace*, Justice O'Connor said the purpose inquiry should be deferential and limited, and, if a secular purpose behind a statute is plausible, the court should look only at the statute on its face, its official legislative history, or its interpretation by a responsible administrative agency. *Id.*

While the court agrees with the Chief Justice that there is a difference between

motive and purpose, it finds that difference to be less pronounced (and therefore less identifiable) when a single individual, as opposed to a group of individuals such as an entire legislature, is responsible for the challenged practice. And the difference is even less pronounced when the challenged practice is not a written statute.

In making a distinction between purpose and motive, the *Mergens* Court distinguished between the professed purpose of a statute, as embodied by its text, and the motivations of individual legislators in. drafting or voting for the statute. *Mergens,* 496 U.S. at 249, 110 S.Ct. at 2371. In the present case, the "law" in question is really an action taken by Justice Moore. In determining the purpose of that action, the court must consider the reasoning of the person who took it. Unlike a statute, the purpose of which can be analyzed with reference to available written materials and without reference to the individual motivations of legislators, the purpose of Justice Moore's action can only be understood with respect to his own reasoning in taking it. Therefore, the distinction between motive and purpose in this case is much more of an artificial construct than it is in cases involving challenges to written laws.

For example, the court cannot fully accept the Chief Justice's argument that his speech unveiling the monument shows his "purpose" (because he was wearing his Chief Justice "hat" during that speech), while an interview he gave just over one month later with Dr. James Kennedy of Coral Ridge Ministries shows his "intent" (because he was wearing his individual "hat" during that interview).[6] Surely, the Chief Justice (and, in particular, when he is acting as Chief Justice Moore, the legal and administrative head of the State of

Alabama) does not think that speeches are not a part of his duties as a Justice. To accept such a distinction would raise many difficult line-drawing issues as to when, exactly, a government actor is speaking in his individual capacity and when he is speaking in his professional capacity. For example, when the Chief Justice helped to install the monument on the night of July 31, 2001, was he doing so in his individual capacity or his capacity as Chief Justice? This distinction is complicated by the fact that the Chief Justice suggested at trial that Moore, the individual, gave the monument to Moore, the Chief Justice. The Chief Justice has proposed no objective criteria to help the court differentiate between the two.

 The court, however, need not and therefore will not decide the ramifications of the difference between "motive" and "purpose" in this case. It is sufficient for present purposes to recognize that a court looking at "purpose" in an Establishment Clause case may look beyond the stated legislative purpose. As the Supreme Court has explained, "[i]n applying the purpose test, it is appropriate to ask 'whether government's *actual* purpose is to endorse or disapprove of religion.'" *Wallace v. Jaffree,* 472 U.S. 38, 56, 105 S.Ct. 2479, 2489, 86 L.Ed.2d 29 (1985) (emphasis added) (citations omitted); *accord Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290, 308, 120 S.Ct. 2266, 2278, 147 L.Ed.2d 295 (2000) ("When a governmental entity professes a secular purpose for an arguably religious policy, the government's characterization is, of course, entitled to some deference. But it is nonetheless the duty of the courts to 'distinguish a sham secular purpose from a sincere one.'") (citations omitted). While this

---

**6.** The court has an especially difficult time with this distinction here because of the extent to which the Chief Justice's religious views control his understanding of the structure of government. *See infra,* part II(C)(3).

statement is not particularly elucidating as to the difference between motive and purpose, it does make it clear that the court must look beyond the Chief Justice's stated purpose to his actual purpose. For example, in *Jaffree*, the Court specifically examined evidence of the legislative intent contained in the legislative record and the testimony of the challenged bill's sponsor. 472 U.S. at 58, 105 S.Ct. at 2490.

Additionally, the Chief Justice has admitted that certain statements he has made, beyond his oft-repeated statement that the monument was installed "to restore the moral foundation of law," are indicative of his purpose for installing the monument. Specifically, the Chief Justice admits that the speech he gave at the monument's unveiling, various answers he gave in his deposition, and, of course, portions of his trial testimony are evidence of his purpose. The Chief Justice does argue, however, that many of the plaintiffs' other evidentiary submissions constitute evidence of motive and therefore should not be considered by the court in determining the constitutionality of his installation of the monument. These include all evidence relating to following:

(1) His campaign for Chief Justice: the Chief Justice's campaign referred to him as the "Ten Commandments Judge" and almost everything distributed by the campaign referenced the Ten Commandments. Additionally, the Chief Justice sent a thank-you note to campaign contributors reading, in part, "It is our hope that next year at this time, the Ten Commandments will be displayed in the Alabama Supreme Court, and the acknowledgment of God will be permitted and encouraged in all Alabama public forums under then Chief Justice Moore's leadership."

(2) Interviews he has given on TV and radio: For example, on a segment entitled "One True God," aired by Coral Ridge Ministries as part of a television program in October 2001, the Chief Justice discussed the "long, continuous battle that I have fought over acknowledging God.... I have put the monument depicting the sovereignty of God and his standards in the Judicial building. And I have no intention of removing them. We will defend it, because it is truth, and you can't deny truth."

(3) His relationship with Coral Ridge Ministries: the Chief Justice has appeared on a number of television and radio programs created by Coral Ridge.

(4) Speeches he has given at different rallies: For example, after he was elected Chief Justice, the Chief Justice appeared at a rally in Tennessee on December 2, 2001, in which he gave a speech stating, in part, that "God gave us our rights; government is to secure it. If it doesn't—if it denies God, it should be abolished."

The plaintiffs, on the other hand, argue that these public statements should be considered by the court in assessing both the Chief Justice's purpose for installing the monument and the effect the monument will have on a reasonable observer.

■ The court will not resolve this dispute, however, because it is clear from the Chief Justice's trial testimony, as well as the evidence that he concedes reflects his purpose, that he erected the monument with an improper purpose. As such, the court need not resolve the distinction between purpose and motive, nor need it decide which of the Chief Justice's statements are properly considered by the court in determining his purpose under the *Lemon* test. Rather, in finding the Chief Justice's purpose unconstitutional, the court has limited its consideration to the speech given by the Chief Justice at the monument's unveiling, the Chief Justice's trial testimony and trial exhibits discussed in parts II(B) and II(C)(1) of this opinion, and the monument itself. The Chief Jus-

tice admits that this evidence should be considered to determine his purpose in erecting the monument, and Supreme Court precedent shows that this evidence is properly considered by the court. *See Jaffree,* 472 U.S. at 58, 105 S.Ct. at 2490.

### III.

The court appreciates that there are those who see a clear secular purpose in the Ten Commandments, for they command not only such things as "I am the Lord thy God" and "Thou shalt have no other Gods before me" but also, among other things, that "Thou shalt not kill" and "Thou shalt not steal," and that we should "Honour thy father and thy mother." If all Chief Justice Moore had done were to emphasize the Ten Commandments' historical and educational impor-

tance (for the evidence shows that they have been one of the sources of our secular laws) or their importance as a model code for good citizenship (for we all want our children to honor their parents, not to kill, not to steal, and so forth), this court would have a much different case before it. But the Chief Justice did not limit himself to this; he went far, far beyond. He installed a two-and-a-half ton monument in the most prominent place in a government building, managed with dollars from all state taxpayers, with the specific purpose and effect of establishing a permanent recognition of the "sovereignty of God," the Judeo–Christian God, over all citizens in this country, regardless of each taxpaying citizen's individual personal beliefs or lack thereof. To this, the Establishment Clause says no.[7]

---

7. In *Lamb's Chapel v. Center Moriches Union Free School District,* 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993), Justice Scalia comments on the "strange notion, that a Constitution which *itself* gives 'religion in general' preferential treatment (I refer to the Free Exercise Clause) forbids endorsement of religion in general." 508 U.S. at 400, 113 S.Ct. at 2151 (Scalia, J., concurring).

With deeper reflection, however, this "notion" may not be so "strange." It is generally accepted that, at the time of the framing of the Constitution, this country was predominantly Christian, and it appears that Christianity was not merely tolerated but viewed as essential to this country's democratic success. George Washington, Farewell Address (September 1796) ("Of all the dispositions and habits which lead to political prosperity, religion and morality are indispensable supports."); Alexis de Tocqueville, *Democracy in America* 445 (George Lawrence trans., J.P. Mayer ed., Perennial Classics 2000) ("Religious nations are therefore naturally strong on the point on which democratic nations are weak; this shows of what importance it is for men to preserve their religion as their conditions become more equal."). Thus, it makes sense that something viewed at the time as so essential as was religion would be given "preferred treatment" by being addressed in the First Amendment to the United States Constitution. But what history also taught at that

time was that religion, and particularly Christianity, made this contribution working as a private institution and outside the framework of formal government. Alexis de Tocqueville, *Democracy in America* 47 (George Lawrence trans., J.P. Mayer ed., Perennial Classics 2000) ("Religion, being free and powerful within its own sphere and content with the position reserved for it, realized that its sway is all the better established because it relies only on its own powers and rules men's hearts without external support."). Indeed, this same history taught that when government interfered with religion, religion (and, in particular, Christianity) suffered. This is evidenced by the many instances in which people have been persecuted for their religious beliefs, well-known to anyone who has studied American History.

Thus, the First Amendment gave "preferred treatment" to religion, and, in particular, to Christianity, by assuring that there would be no governmental interference with, including even "endorsement" of, it. In other words, as indeed history has shown, Christianity flourishes best when it is left alone by government. So, it could be argued that, because this country began as a Christian nation, the First Amendment's ban on government interference with religion in general has actually encouraged the flourishing of not just religion but Christianity in particular. Whether the founders in framing the First Amendment in-

The plaintiffs ask that the court enter an injunction requiring Chief Justice Moore to remove his Ten Commandments monument forthwith. The court declines to enter such an injunction at this time. Instead, the court will enter a declaration that Justice Moore's placement of his Ten Commandments monument in the Alabama State Judicial Building was unconstitutional, and will allow Justice Moore thirty days to remove it. If the monument is not removed within thirty days, the court will then enter an injunction requiring Justice Moore to remove it within fifteen days thereafter.

An appropriate judgment will be entered.

## JUDGMENT

In accordance with the memorandum opinion entered today, it is the ORDER, JUDGMENT, and DECREE of the court that:

(1) Judgment is entered in favor of plaintiffs Stephen R. Glassroth, Melinda Maddox and Beverly Howard, and against defendant Roy S. Moore.

(2) It is DECLARED that defendant Moore's placement of his Ten Commandments monument in the Alabama State Judicial Building violated the Establishment Clause of the First Amendment to the United States Constitution, as incorporated into the Fourteenth Amendment and enforced by 42 U.S.C.A. § 1983. Defendant Moore is given thirty days from the date of this judgment to remove the monument.

The court retains jurisdiction to impose and enforce an injunction should one become necessary.

It is further ORDERED that costs are taxed against defendant Moore, for which execution may issue.

DONE, this the 18th day of November, 2002.

---

tended this (that is, to foster Christianity specifically), the court cannot say, for it lacks adequate historical expertise; but it is an interesting question.

### APPENDIX A
*The Ten Commandments Monument*

### APPENDIX B

*Quotations inscribed on the monument's four sides*

*Front (North) side*

"Laws of nature and of nature's God"—Declaration of Independence

"The laws of nature are the laws of God, whose authority can be superseded by no power on earth"—George Mason [Taken from arguments submitted by George Mason in *Robin v. Hardaway*, 2 Va. Reports (Jeff.) 109, 114 (Va.1772)]

"The transcendent law of nature and of nature's God, which declares that the safety and happiness of society are the objects at which all political institutions aim, and to which all such institutions must be sacrificed"—James Madison [Taken from *The Federalist* No. 43, at 295]

"This law of nature, being co-eval with mankind and dictated by God himself, is of course superior in obligation to any other. It is binding over all the globe, in all countries, and at all times: no human laws are of any validity if contrary to this; ... upon these two foundations, the law of

nature and the law of revelation, depend all human laws; that is to say, no human laws should be suffered to contradict these"—William Blackstone [Taken from Volume I of *The Commentaries of the Law of England,* "Of the Rights of Persons," at 41 (1765)]

*Right (West) side*

"In God We Trust"—National Motto

"We, the people of the state of Alabama, in order to establish justice, insure domestic tranquillity, and secure the blessings of liberty to ourselves and our posterity, invoking the favor and guidance of almighty God, do ordain and establish the following constitution and form of government for the state of Alabama"—Constitution of Alabama

"O thus be it ever when freemen shall stand between their lov'd home and the war's desolation! Blest with vict'ry and peace may the heav'n rescued land praise the power that hath made and preserv'd us a nation! Then conquer we must, when our cause it is just, and this be our motto—'in god is our trust,' and the star-spangled banner in triumph shall wave o'er the land of the free and the home of the brave"—National Anthem

*Back (South) side*

"So help me God"—Judiciary Act of 1789

"Let it simply be asked, where is the security for property, for reputation, for life, if the sense of religious obligation desert the oaths which are the instruments of investigation in the courts of justice?"—George Washington [Taken from Washington's Farewell Address of 1796]

"The greater part of evidence will always consist of the testimony of witnesses—this testimony is given under those solemn obligations which an appeal to the God of truth impose; and if oaths should cease to

be held sacred, our dearest and most valuable rights would become insecure"—John Jay [Taken from John Jay's charge to the grand jury of the circuit court for the district of Vermont on June 25, 1772, at 284]

*Left (East) side*

"One nation under God, indivisible, with liberty and justice for all"—Pledge of Allegiance 1954

"The inclusion of God in our pledge therefore would further acknowledge the dependence of our people and our government upon the moral directions of the creator"—Legislative History [Taken from the House Report of legislation adopting the Pledge of Allegiance, at 2340]

"Human law must rest its authority ultimately upon the authority of that law which is divine"—James Wilson [Taken from Volume I of The Works of the Honourable James Wilson, at 104–05 (Bird Wilson ed. 1804)]

"And can the liberties of a nation be thought secure when we have removed their only firm basis, a conviction in the minds of the people that these liberties are of the gift of god? That they are not to be violated but with his wrath?"—Thomas Jefferson [Taken from Notes on the State of Virginia, at 169]

### APPENDIX C

*Speech by Justice Moore at monument's unveiling ceremony*

First, let me thank you for your attendance here today. We appreciate you coming, and some of you have come from great distances. I thank Mr. Parker, my legal advisor in the Administrative Office of Courts, for that introduction.

By the authority vested in me by the Constitution of the State of Alabama as

Chief Justice of the Alabama Supreme Court, as administrative head of the judicial system of this state, by the authority vested in me by Section 41–10–275 as Chief Justice, as the authorized judicial representative of the Unified Judicial System, and finally by the authority vested in the Chief Justice as the authorized representative under the lease of this building in which you stand, I'm pleased to present this monument depicting the moral foundation of our law and hereby authorize it to be placed in the rotunda of the Alabama Judicial Building.

It is altogether fitting and proper that we should do this. By placement of this monument in the rotunda housing the Alabama Supreme Court, the Alabama Court of Criminal Appeals, the Alabama Court of Civil Appeals, the Alabama State Law Library, and the Alabama Administrative Office of Courts, this monument will serve to remind the appellate courts and judges of the circuit and district courts of this state, the members of the bar who appear before them, as well as the people who visit the Alabama Judicial Building, of the truth stated in the preamble of the Alabama Constitution, that in order to establish justice, we must invoke "the favor and guidance of Almighty God."

"The institutions of our society are founded on the belief that there is an authority higher than the authority of the State, that there is a moral law which the State is powerless to alter, and that the individual possesses rights conferred by the Creator which government must respect. The Declaration of Independence stated the now familiar theme, We hold these truths to be self-evident, that all men are created equal, that they're endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness. In the body of the Constitution as well as the Bill of Rights is enshrined these principles."

Some of you might think the words that I just spoke are my words, carefully structured to fit my own ends; or perhaps a quote from a past long ago, but certainly not true or relevant to our law today. On the contrary, those words are not my words, they're not an ancient quote relevant to law. They're the words of Justice William O. Douglas in 1961 in the case of *McGowan v. Maryland.*

But today, a mere forty years later, many judges and other government officials across our land deny that there's a higher law. They forbid teaching your children that they're created in the image of Almighty God, and that while they purport all the while that it is government and not God who gave us our rights. Not only have they turned away from those absolute standards which form the basis of our morality and the moral foundation of our law, but they have divorced the Constitution and the Bill of Rights from these principles. As they have sown the wind, so we have reaped the whirlwind, in our homes, in our schools and in our workplaces.

When I ran for the office of Chief Justice of the Alabama Supreme Court, I made a pledge to restore the moral foundation of law. It is axiomatic that to restore morality, we must first recognize the source of that morality. From our earliest history in 1776, when we were first pleased to be called the Untied States of America, our forefathers recognized the sovereignty of God.

As late as 1954, the United States Congress placed in our Pledge of Allegiance the word "under God," and said the inclusion of God in our pledge, therefore, would further acknowledge the dependence of our people and our government upon the moral directions of the Creator. Judges,

legislators, and executive officers around our country have, since our nation's birth, consistently pledged under oath, "so help me God," to uphold the Constitution.

Immediately after my election in November of 2000, I contacted Mr. Richard Hahnemann, an accomplished sculptor, to assist me in the construction and design of this monument. Based upon my specifications, he worked, together with myself and my legal assistant and attorney, Mr. Stephen Melchior, for the past eight months to complete this project.

I would like to point out that no tax funds are used in the construction or installation, which was accomplished last evening so as not to conflict with this workplace. I would like to recognize Clark Memorial of Birmingham, Mr. Pierre Tourney, Sr., Mr. Pierre Tourney, Jr., for their help in the construction, design and installation, as well as the transportation of this monument to this building.

And what an appropriate date this is. For it was on August 1st of 1776, exactly 225 years ago today, that Samuel Adams, the father of the American Revolution, stood before a rather large crowd at the Philadelphia State House. And on its steps, he delivered a speech prior to the formal signing of the Declaration of Independence on August 2nd of 1776. He began by stating, "We have explored the temple of royalty and found that the idol that we have bowed down to has eyes which see not, ears that hear not our prayers, and a heart like the nether millstone."

Today a cry has gone out across our land for the acknowledgment of that God upon whom this nation and our laws were founded and for those simple truths which our forefathers found to be self-evident; but once again, we find that those cries have fallen upon eyes that have seen not, ears that hear not our prayers, and hearts much like that nether millstone.

Samuel Adams concluded his remarks by saying, "We have this day restored the Sovereign, to whom alone all men ought to be obedient. He reigns in Heaven and with a propitious eye beholds his subjects assuming that freedom of thought and dignity of self-direction which he bestowed upon them. From the rising to the setting sun, may His kingdom come." And may this day mark the restoration of the moral foundation of law to our people and the return to the knowledge of God in our land.

This monument, ladies and gentlemen, tells a story. If you look to the front, you'll see on the inset, "The Laws of Nature and of Nature's God." It was on those laws, the will of the Maker, upon which the Declaration of Independence was premised and upon which the Constitution was predicated.

James Madison, for example, the chief architect of the Constitution, said we were entitled to have a constitution because of the transcendent law of nature and of nature's God, which declares that the safety and happiness of society are the objects at which all political institutions aim and to which all such institutions must be sacrificed.

They knew the law. The law was clearly written by Sir William Blackstone, which was the law of this country for many, many decades. He said, "This law of nature, being co-eval with mankind and dictated by God himself, is, of course, superior in obligations to any other. It is binding over all the globe in all countries and at all times, and no humans laws are of any validity if contrary to this." This law of nature and the law of revelation pin all human laws on these two foundations.

On each side of this monument, you'll see quotes from various presidents. For example, George Washington, on the back,

 

said, "Let it simply be asked, where is the security for property, for reputation, for life, if the sense of religious obligation desert the oaths which are the instruments of investigation in our courts of justice."

The first Chief Justice, John Jay, also with President Washington, said, "If testimony of witnesses, if the oaths ever cease to be held sacred, our dearest and most precious rights will become insecure."

On the right side as you face it, you'll see the Constitution and the Preamble of Alabama, which says that we must invoke the favor and guidance of Almighty God; but you'll also sing—see that National Anthem. Oh, you won't see the first stanza, "Oh, say can you see"—you know it very well—"by the dawn's early light." You'll see the verse we neglect today: "Thus be it ever when freemen shall stand between their loved home and the war's desolation, blest with vict'ry and peace. May the heaven rescued land praise the power that has made and preserved this nation. And conquer we must when our cause it is just. And this be our motto—in god is our trust. And the star-spangled banner in triumph shall wave over the land of the free and the home of the brave."

Indeed, in 1956, the United states Congress, by act of Congress, by law today, made "In God We Trust" our national anthem—our national motto. "So help me God," by which we pledge to uphold the constitution, has been around since 1789, when the Judiciary Act established that as the basis of our oath.

You'll see quotes from that famous third President of the United States, Thomas Jefferson. He said, "Can the liberties of a nation be thought secure when we have removed their only firm basis, a conviction in the minds of the people that these liberties are the gift of God, that they're not to be violated but with his wrath?" Indeed, I

tremble for my country when I reflect that God is just and that His justice cannot sleep forever.

Surrounding this monument, you see every ounce of support for the acknowledgment of the sovereignty of that God and those absolute standards upon which our laws are based. Oh, this isn't surrounding the plaque with history, historical documents. All history supports the acknowledgment of God. You'll find no documents surrounding the Ten Commandments because they stand alone as an acknowledgment of that God that's contained in our pledge, contained in our motto, and contained in our oath.

I thank you very much for your attendance today. And I'll allow any questions to be answered by my public information officer and my attorney. Thank you.

## APPENDIX D

*Quotations inscribed on the Moral Foundation of Law plaque*

"A just law is a man-made code that squares with the moral law or the law of God. An unjust law is a code that is out of harmony with the moral law. To put it in terms of St. Thomas Aquinas: An unjust law is a human law that is not rooted in eternal law and natural law."—Martin Luther King, Jr., Letter from Birmingham Jail, April 16, 1963

"The first work of slavery is to mar and deface those characteristics of its victims which distinguish men from things, and persons from property. Its first aim is to destroy all sense of high moral and religious responsibility. It reduces man to a mere machine. It cuts him off from his Maker, it hides him from the laws of

God."—Frederick Douglass, December 1, 1850